UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOYAL BANK LIMITED, *et al.*,

                              Plaintiffs,

              v.

MASTERCARD INTERNATIONAL
INCORPORATED,

                              Defendant.

No. 20-CV-2208 (KMK)

OPINION & ORDER

Appearances:

Michael Tremonte, Esq.
Yu Han, Esq.
Sher Tremonte LLP
New York, NY
*Counsel for Plaintiffs*

Rena Andoh, Esq.
Caitlin Ross, Esq.
Kelly McCullough, Esq.
Sheppard, Mullin, Richter & Hampton LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs Loyal Bank Limited ("Loyal Bank"), and Ikins Clarke ("Clarke") and Rikhi

Rampersad ("Rampersad"), as joint liquidators of Loyal Bank Limited (collectively,

"Plaintiffs"), bring this Action against Mastercard International Incorporated ("Defendant" or

"Mastercard"), alleging that Defendant breached its contracts with Loyal Bank and assessed

Loyal Bank an illegal termination fee.  (Am. Compl. ("AC") (Dkt. No. 18).)  Before the Court is

Defendant's Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the

"Motion").  (*See* Not. of Mot. To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Not. of Mot.")

(Dkt. No. 30).)  For the reasons that follow, the Motion is granted in part and denied in part.

I.  Background

A.  Factual Background

The following facts are taken from Plaintiffs' Amended Complaint, (AC), and documents

of which the Court may take judicial notice.  They are assumed true for purposes of deciding the

Motion.

On September 28, 2007, Loyal Bank and Mastercard entered into a Mastercard License

Agreement (the "License Agreement").  (AC ¶ 23; Decl. of Rena Andoh in Supp. of Mastercard

Int'l Inc.'s Mot. to Dismiss ("Andoh Decl.") Ex. A ("License Agreement") (Dkt. No. 32-1).)[1]

The License Agreement authorized Loyal Bank to issue debit cards using the "MasterCard"

mark.  (AC ¶ 23; License Agreement ¶ 2.)  In turn, Loyal Bank, among other things, agreed to

"never take any action . . . to injure, harm[,] or dilute the . . . goodwill in and to any of the

Marks."  (License Agreement ¶ 7.)  Loyal Bank also agreed to "observe all Rules adopted in

connection with Authorized Marks."  (*Id.* ¶ 6; *see also id.* ¶ 18 (noting that the Rules are

incorporated into the License Agreement).)  The License Agreement provided that, if a

"condition occurs that, under a Rule . . . permits the termination of th[e] License Agreement . . .

then MasterCard may terminate th[e] License Agreement as provided in such Rule."  (*Id.*

¶ 11(f).)  The Mastercard Rules ("Rules") allowed Mastercard "at its sole discretion" to

terminate the License Agreement "effective immediately and without prior notice" if, among

---

[1] The Court may consider the License Agreement and other exhibits to the Andoh
Declaration cited in this Opinion & Order because they are integral to the Amended Complaint.
*See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006)
(noting that "a contract . . . containing obligations upon which the plaintiff's complaint stands or
falls" is integral to a complaint); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42,
48 (2d Cir. 1991) (holding that the court "could have viewed [documents] on the motion to
dismiss because there was undisputed notice to [the] plaintiffs of their contents and they were
integral to [the] plaintiffs' claim").

other things, Loyal Bank "directly or indirectly engage[d] in or facilitate[d] any action or activity that is illegal, or that, in the good faith opinion of Mastercard . . . has damaged or threatens to damage the goodwill or reputation of Mastercard or any of its Marks."  (AC ¶ 26 (brackets omitted); *see also* Andoh Decl. Ex. B ("Rules") ¶ 1.13.2(9) (Dkt. No. 32-2).)  The Rules also contained Standards, including "[u]phold[ing] the value of the Mastercard brands," "[a]ct[ing] with financial integrity and in compliance with the Standards and the law," and "[e]ngag[ing] in rigorous fraud management practices."  (Rules 8.)  Under the Rules, Mastercard "reserve[d] the right to limit, suspend, or terminate [the License Agreement] . . . if [Loyal Bank] [did] not comply with any Standards."  (Rules ¶ 2.1.2; *see also* AC ¶ 26.)

The License Agreement and Rules also established obligations for Loyal Bank in the event that the License Agreement was terminated.  According to the License Agreement, Loyal Bank was to "remain liable on all amounts due . . . pursuant to the Rules and for [Loyal Bank's] appropriate share of the expenses properly incurred prior to the termination date" and to "otherwise remain liable for all amounts which became due pursuant to the Rules . . . on account of such termination."  (License Agreement ¶ 14(c)-(d).)  The Rules contained similar requirements.  (*See* Rules ¶ 1.13.4(2) ("A terminated Customer . . . must promptly pay to [Mastercard] (a) any and all applicable dues, fees, assessments, or other charges as provided in the Standards and (b) all other charges, debts, liabilities, and other amounts arising or owed . . . .").)  In addition, the Rules required Loyal Bank to "timely pay . . . all fees, charges, assessments and the like . . . , including those set forth in the applicable regional Mastercard Consolidated Billing System manual (the "Manual").  (*Id*. ¶ 3.8 (italics omitted).)  The Manual contained a clause (the "Termination Fee Clause") requiring a termination fee equal to the greater of $500 or the sum of, in relevant part,

3

> The highest total amount [Loyal Bank] was billed and/or paid . . . as assessments and as fees and charges for services provided directly or indirectly by Mastercard . . . , in a single year during the four calendar years preceding the year in which the termination is effective . . . and . . . [a]ny federal, state, local, or other government taxes or charges that are attributable to the above amounts . . . .

(Andoh Decl. Ex. D ("Manual") 2MC1901 (Dkt. No. 32-4).)

Pursuant to the License Agreement and Rules, Mastercard and Loyal Bank also entered into a Deposit Account Security Agreement (the "Security Agreement").  (AC ¶ 27; Andoh Decl. Ex. C ("Security Agreement") (Dkt. No. 32-3).)  The Security Agreement required that Loyal Bank open a deposit account containing collateral to secure the performance of its payment obligations to Mastercard.  (AC ¶ 27; Security Agreement ¶ 2.)  Loyal Bank opened such an account (the "Account").  (AC ¶ 28; *see also* Security Agreement Ex. A.)  The Security Agreement defined an Event of Default to include when "any proceeding shall be instituted by or against [Loyal Bank] . . . seeking liquidation."  (Security Agreement ¶ 5.)  The Security Agreement provided that, should an Event of Default occur, Mastercard "without notice or demand may apply the funds in the Account to any unpaid Obligations (including, without limitation, any Obligations that become due as a result of the occurrence of an Event of Default)."  (*Id.* ¶ 6.)

On March 2, 2018, Loyal Bank and two of its officers were indicted.  (AC ¶¶ 31, 34.) The indictment alleged a money laundering conspiracy concerning financial transactions made between two of Loyal Bank's then-officers and an undercover FBI agent.  (*Id.* ¶¶ 33–34.)  Loyal Bank entered a plea of "not guilty," and the case is still pending.  (*Id.* ¶¶ 36–37.)

On March 16, 2018, Mastercard notified Loyal Bank that it was exercising its right under the Rules as incorporated into the License Agreement to suspend the License Agreement.  (*Id.* ¶ 38.)  Loyal Bank's counsel had multiple phone conversations with Mastercard representatives,

including counsel, regarding Loyal Bank's efforts to resolve the indictment.  (*Id.* ¶ 41.)  In one of these conversations on March 29, 2020, Mastercard's counsel made three representations.  (*Id.* ¶ 42.)  First, counsel represented that Mastercard's decision to suspend rather than terminate Loyal Bank was designed to allow Loyal Bank an opportunity to work towards reinstatement. (*Id.*)  Second, counsel represented that Mastercard would not terminate Loyal Bank prior to a decision by the DOJ regarding how to resolve the indictment, so long as Loyal Bank retained its international banking license.  (*Id.*)  And, third, counsel represented that Mastercard's decision regarding whether to terminate Loyal Bank would hinge on whether Loyal Bank would be permitted to move forward with lawful business operations notwithstanding the indictment.  (*Id.*)

Contrary to these representations, Mastercard by letter dated May 22, 2018 purported to exercise its option under Rule 2.1.2 to terminate the License Agreement.  (*Id.* ¶ 43.)  Loyal Bank protested that Mastercard did not have a right to terminate the License Agreement.  (*Id.* ¶ 44.)  In response, Mastercard's outside counsel stated that, in addition to Rule 2.1.2, Mastercard had the right to terminate the License Agreement under Rule 1.13.2.  (*Id.*)  Specifically, Mastercard's counsel stated that "Mastercard has determined, in its sole discretion and in good faith, that, at minimum, Loyal [Bank] has damaged or threatens to damage the reputation of Mastercard, and is therefore subject to termination, without advanced notice, under Rules 1.13.2 and 2.1.2."  (*Id.*)

Also on May 22, 2018, Mastercard announced that it had assessed a termination fee of $2,151,426 pursuant to Rule 1.13.4(2).  (*Id.* ¶ 45.)  Mastercard calculated this sum under Section 2MC1901 of the Manual.  (*Id.* ¶ 47.)  It consisted of $1,674,455 in annual fees payment, and $476,971 in tax reimbursement payment.  (*Id.* ¶ 50.)

On August 24, 2018, "as a proximate result of the wrongful termination of the License Agreement by Mastercard," Loyal Bank was placed in liquidation.  (*Id.* ¶ 51.)  On August 30,

2018, Mastercard, supposedly relying on Rule 1.4, emptied the Account by transferring the entire balance of $1,517,411.37 to partially cover the termination fee.  (*Id.* ¶ 53.)

The Amended Complaint makes three claims.  First, it claims that Mastercard breached the License Agreement by terminating the License Agreement.  (*Id.* ¶¶ 55–69.)  Loyal Bank alleges that Mastercard did not make a good faith decision regarding the effect of Loyal Bank's license on its reputation.  (*Id.* ¶¶ 62–67.)  Second, it seeks a declaratory judgment that Mastercard's imposition of the termination fee was an unenforceable penalty.  (*Id*. ¶¶ 70–82.)  Third, it claims that Mastercard breached the Security Agreement by transferring the funds in the Account to Mastercard.  (*Id.* ¶¶ 83–91.)  Plaintiffs seek compensatory damages of at least $1,517,411.37, a declaratory judgment regarding the allegedly unenforceable penalty, statutory interests, costs, and attorney fees.  (*Id*. at 21.)

B.  Procedural Background

Plaintiffs filed their Complaint on March 11, 2020.  (Compl. (Dkt. No. 1).)  On May 8, 2020, Defendant submitted a pre-motion letter regarding its putative motion to dismiss.  (Dkt. No. 14.)  Plaintiffs replied on May 15, 2020, indicating that they planned to file an amended complaint.  (Dkt. No. 15.)  The Court granted Plaintiffs' request for a deadline of June 1, 2020, (Dkt. No. 16), and Plaintiffs timely filed their Amended Complaint, (AC).[2]  The Parties exchanged further pre-motion letters, (Dkt. Nos. 23, 26), and the Court scheduled a pre-motion conference, (Dkt. No. 27).  On November 12, 2020, the Court held a pre-motion conference and adopted a briefing schedule.  (*See* Dkt. (minute entry for Nov. 12, 2020); Dkt. No. 29.)  On

---

[2] Plaintiffs initially filed their Amended Complaint on June 1, 2020.  (Dkt. No. 17.) However, the Clerk's Office rejected their filing because it was labeled "Complaint" rather than "Amended Complaint."  (*See* Dkt. (entry for June 2, 2020).)  The Court accepts as timely Plaintiffs' properly-labeled Amended Complaint, which was filed on June 2, 2020.  (AC.)

December 7, 2020, Defendant submitted its Motion To Dismiss.  (*See* Not. of Mot.; Mem. of

Law in Supp. of Def.'s Mot. to Dismiss ("Def.'s Mem.") (Dkt. No. 31); Andoh Decl. (Dkt. No.

32).)  On January 9, 2021, Plaintiffs filed their Opposition.  (Pls.' Mem. of Law in Opp'n to Def.

Mastercard Int'l Inc.'s Mot. To Dismiss the First Am. Compl. ("Pls.' Mem.") (Dkt. No. 37).)  On

January 22, 2021, Defendant filed its Reply.  (Reply Mem. of Law in Further Supp. of Def.'s

Mot. To Dismiss ("Def.'s Reply") (Dkt. No. 38).)

## II.  Discussion

### A.  Standard of Review

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual

allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.

*Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).  The Court, however, is not required to credit

"mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555

(2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Id.* at 678 (citation and

quotation marks omitted).  A claim is facially plausible "when the plaintiff pleads factual content

that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*  Specifically, the plaintiff must allege facts sufficient to show "more

than a sheer possibility that a defendant has acted unlawfully," *id.*, and if the plaintiff has not

"nudged [his] claims across the line from conceivable to plausible, [the] complaint must be

dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).  Accordingly, the "purpose

of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal

sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding

its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation and

quotation marks omitted).  To decide the motion, the Court "may consider the facts as asserted

within the four corners of the complaint together with the documents attached to the complaint as

exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito*

*Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and quotation

marks omitted).

> B.  Analysis

>> 1.  Count One: Breach of License Agreement

Defendant argues that Plaintiffs do not plausibly allege that Defendant breached the

License Agreement by terminating the License Agreement.  (Def.'s Mem. 9–16.)  The Court

disagrees.

"[T]o state validly a breach of contract claim under New York law, 'a plaintiff need only

allege (1) the existence of an agreement, (2) adequate performance of the contract by the

plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Fort Prods., Inc. v. Men's*

*Med. Clinic, LLC*, No. 15-CV-376, 2016 WL 797577, at *2 (S.D.N.Y. Feb. 23, 2016) (alteration

omitted) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d

168, 177 (2d Cir. 2004)).  "Even under the more relaxed pleading standards of Rule 8, the

complaint must still allege the provisions of the contract upon which the claim is based, and, at a

minimum, the terms of the contract, each element of the alleged breach and the resultant

damages." *Sedona Corp. v. Ladenburg Thalmann & Co.*, No. 03-CV-3120, 2009 WL 1492196, at *9 (S.D.N.Y. May 27, 2009) (citation, alterations, and quotation marks omitted).[3]

Defendant does not contest the validity of the License Agreement or Plaintiffs' damages. (*See* Def.'s Mem.)  Nor does it contest that Plaintiffs have adequately alleged that they performed under the License Agreement.  (*See id.*; *see also* AC ¶ 57 ( "Loyal Bank substantially performed its obligations under the License Agreement . . . .").)  Instead, Defendant argues that Plaintiffs have failed to allege a breach because they have not plausibly alleged that Defendant acted in less than good faith in terminating the License Agreement.  (Def.'s Mem. 11–16.)[4]

Central to Defendant's argument is Judge Rakoff's opinion in *Nader v. ABC Television, Inc.*, 330 F. Supp. 2d 345 (S.D.N.Y. 2004), *aff'd*, 150 F. App'x 54 (2d Cir. 2005).  In *Nader*, the plaintiff was an actor employed by the defendant.  *Id.* at 346.  His contract contained a similar morals clause.  It permitted the defendant to terminate the plaintiff if, in the defendant's "opinion," the plaintiff "commit[ed] any act or [did] anything which might tend to bring [the plaintiff] into public disrepute, contempt, scandal, or ridicule, or which might tend to reflect unfavorably on [the defendant]."  *Id.* at 347–48.  In 1997, the plaintiff was arrested, and the defendant took no adverse employment action.  *Id.* at 346–47.  After the plaintiff was arrested a second time in 2001, the defendant suspended him "pending the outcome of th[e] . . . charge."

---

[3] Defendant does not argue that the heightened pleading requirement for fraud under Rule 9(b) applies.  (*See generally* Def.'s Mem.)  "Accordingly, the Court will evaluate Plaintiffs' Amended Complaint[] under Rule 8, not Rule 9(b)'s heightened pleading requirements applicable to fraud-based claims." *Aurelius Cap. Master, Ltd. v. Republic of Arg.*, No. 19-CV-10109, 2021 WL 1177465, at *7 (S.D.N.Y. Mar. 29, 2021) (holding that a claim regarding a "bad faith . . . breach of [a contract's] terms" did "not sound in fraud and thus [was] not subject to Rule 9(b)'s heightened pleading requirements").

[4] Defendant argues separately that contractual morals clauses are generally valid.  (Def.'s Mem. 9–10.)  Because Plaintiffs concede this argument, (Pls.' Mem. 7), the Court without deciding assumes that it is true.

*Id.* at 347 (alteration and record citation omitted).  The defendant stated that "any further decision on [the plaintiff's] employment status would be based on a review of the outcome of th[e] indictment," and that "if the[] charges are not true, . . . [the defendant] would like [the plaintiff] to come back to work."  *Id.* (record citation and quotation marks omitted).  Despite these statements, the defendant roughly two weeks later terminated the plaintiff based on his violation of a contractual morals clause.  *Id.*  In *Nader*, the district court granted summary judgment for the defendant, *id.* at 349–50, and the Second Circuit affirmed, 150 F. App'x 54 (2d Cir. 2005) (summary order).

The Court agrees with Plaintiffs' argument that *Nader* is distinguishable because the ruling took place on summary judgment, rather than on a motion to dismiss.  (*See* Pls.' Mem. 12.)  In *Nader*, the court noted that the defendants had adduced undisputed evidence that the "plaintiff's arrest occasioned publicity and media attention, and that [the defendant] was concerned about the coverage."  330 F. Supp. 2d at 348 (record citation omitted).  Here, there is no such evidence, as the Court may consider only the Amended Complaint.  The Amended Complaint contains only two claims regarding Plaintiffs' effect on Defendant's reputation.  The first is that the indictment contained no claims that Plaintiffs were aware of their officers' actions, condoned their behavior, or had engaged in illegal transactions with actual Loyal Bank customers.  (AC ¶ 58.)  The second is that the indictment did not mention Mastercard, and that no media coverage of the indictment links Mastercard to any wrongdoing alleged therein.  (*Id.* ¶ 59.)  At this stage, where the Court can rely only on the claims of the Amended Complaint, the

Court cannot infer from these two allegations that Defendant in good faith had the opinion that Plaintiffs' licensee status harmed its reputation.[5]

It is true that the plaintiff in *Nader* raised arguments similar to those Plaintiffs raise here. For example, in *Nader*, the court rejected the plaintiff's argument that the defendant had a "contractual obligation to *immediately* terminate [the plaintiff] for violations of the morals clause." 330 F. Supp. 2d at 348 (emphasis added). Here, Plaintiffs make a similar argument: "Mastercard purported to terminate Loyal Bank based on unproven allegations against Loyal Bank, even though it had been aware of those allegations and expressed no reputational concerns about them for months, and specifically promised Loyal Bank an opportunity to reinstate its license." (Pls.' Mem. 9.) Separately, in *Nader* the plaintiff argued on appeal that the defendant's failure to discipline its other employees who were arrested showed "that [the plaintiff's] conduct was not violative of the 'morals clause.'" Brief of Plaintiff-Appellant at 52–53, *Nader v. ABC Television, Inc.*, 150 F. App'x 54 (2d Cir. 2005) (No. 04-5034-CV), 2005 WL 3948605. The Second Circuit rejected as "meritless" the argument that the plaintiff's "conduct did not fall within the terms of the morals clause." *Nader*, 150 F. App'x at 56. Here, Plaintiffs make a similar argument: that Defendant terminating Loyal Bank marked "a rare, if not unprecedented break from [Mastercard's] long-standing practice" of inaction against other entities that "affirmatively admitted to and accepted responsibility for violating U.S. law." (Pls.' Mem. 10.)

---

[5] The same is true of *Arbor Leasing, LLC v. BTMU Capital Corp.*, No. 603151/06, 2014 WL 136500 (N.Y. Sup. Ct. Jan. 14, 2014). There, the court held that the defendant submitted evidence "that the incarceration and absence of [the plaintiff's] principal, and the resulting media attention, was 'materially harmful, or potentially materially harmful, to the business interests or reputation of [the defendant].'" *Id.* at *3 (record citation omitted). As with *Nader*, there exists no basis for the Court to draw a similar conclusion at this stage.

However, the similarity of the arguments does not alter the Court's conclusion.  In *Nader*, the defendant had adduced undisputed evidence "that [the] plaintiff's arrest occasioned publicity and media attention, and that [the defendant] was concerned about the coverage."  330 F. Supp. 2d at 348 (record citation omitted).  Because this concern was a "facially legitimate reason for termination," the burden shifted to the plaintiff "to adduce evidence that [the defendant's] stated reason for termination was pretextual and that the real reason was discriminatory."  *Id.* at 347–48.  The court in *Nader* held that the plaintiff's evidence of delayed action and inconsistent discipline failed to meet this burden.  *See id.*; 150 F. App'x at 56.

Here, by contrast, Plaintiffs do not need to rebut a facially valid rationale for termination. Instead, they must only plausibly allege that Mastercard terminated the License Agreement in the absence of good faith.  The alleged irregularities—Mastercard's shifting rationale and selective termination of licensees that were accused of or acknowledged criminal wrongdoing—make Plaintiffs' claims more than "conclusory allegations."  *A.J. Sheepskin Leather & Outerwear, Inc. v. USF Ins. Co.*, No. 03-CV-2382, 2004 WL 503727, at *3 (S.D.N.Y. Mar. 12, 2004).  They suffice at this stage to raise an inference that Defendant terminated the License Agreement to extract a termination fee, (*see* AC ¶ 65), or because it determined that its business relationship with Loyal Bank was no longer profitable, (*see* AC ¶ 9), and not because of its good faith opinion regarding the effect of Loyal Bank on its reputation, *cf. Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019) (indicating in the Title VII context that "procedural deficiencies in the university's investigation and adjudication . . . raised an inference that the university was motivated, at least in part, by bias").[6]  This is particularly true because Plaintiffs at this stage

---

[6] For the same reason the Court rejects Defendant's argument that Plaintiffs failed to allege "deliberate misconduct."  (*See* Def.'s Mem. 11 (quoting *Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 384 (S.D.N.Y. 2014)).)

have no access to Mastercard's internal deliberations. *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp. 1033, 1040 (S.D.N.Y. 1993) ("[A]llegations may be based on 'information and belief when facts are peculiarly within the opposing party's knowledge.'" (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990))).[7]  In short, while *Nader* suggests that Plaintiffs may be in trouble if Defendant in discovery adduces evidence of good faith, and Plaintiffs adduce no further evidence of its absence, the Court finds this case inapposite at this stage.[8]

For largely the same reason, the Court rejects Defendant's argument that the Amended Complaint should be dismissed because "there is an obvious alternative explanation for Mastercard's termination of the License Agreement, namely Loyal Bank's indictment for money laundering and violation of the morals clause in the License Agreement and Mastercard Rules." (Def.'s Mem. 12–13 (citing *Wells Fargo Bank Nw., N.A. v. Sundowner Alexandria, LLC*, No. 09-

---

[7] The Court rejects Defendant's argument that the non-terminated licensees are distinguishable because they "are still in business." (Def.'s Mem. 15.)  First, this argument is consistent with Plaintiffs' claim that Loyal Bank was terminated due to economic and not reputational concerns. (AC ¶¶ 9, 65.)  Second, even if this argument could support Defendant's position, the timing does not work out for Defendant.  Defendant terminated the License Agreement on May 22, 2018. (*Id.* ¶ 43.)  Loyal Bank was not placed in liquidation until three months later, on August 24, 2018. (*Id.* ¶ 51.)  Thus, at least at the motion to dismiss stage, Defendant may not rely on Loyal Bank's operational status to explain its inconsistent termination decisions.

[8] The Court finds *Nader* distinguishable in one additional regard.  In *Nader*, the defendant maintained consistently that its decision regarding whether to terminate the plaintiff would be "based on a review of the outcome of th[e] indictment." 330 F. Supp. 2d at 347 (record citation omitted).  Here, by contrast, Mastercard represented to Loyal Bank that its decision would be based on "whether Loyal Bank would be permitted to move forward with its lawful business operations notwithstanding the [i]ndictment[]." (AC ¶ 42.)  Thus, to the extent *Nader* stands for the view that a delayed decision to terminate does not indicate an absence of good faith, the Court agrees with Plaintiffs' position that *Nader* is distinguishable because *Nader* did not involve "shifting rationales because [the defendant's] rationale had remained consistent." (Pls.' Mem. 13 (quotation marks omitted).)

CV-7313, 2010 WL 3238948, at *4, *6 (S.D.N.Y. Aug. 16, 2010)).)  In *Wells Fargo*, the counterclaim plaintiff alleged that the counterclaim defendant "attempted to terminate the sublease agreements by sending default notices" at a time when the counterclaim plaintiff "was current on all of its payment obligations . . . and there was no event of default."  2010 WL 3238948, at *5.  The counterclaim defendant provided the court the notices of default referenced in the counterclaims, as well as the counterclaim plaintiff's replies.  *Id*.  "[T]he crux" of the counterclaim plaintiff's replies was that it "was not going out of business and would be able to meet its future contractual obligations."  *Id*.  In light of these protests, the court found that "the obvious and more likely explanation" for the counterclaim defendant terminating the contract was not bad faith, but a "concern that [the counterclaim plaintiff] was going out of business."  *Id*. at *6.  Here, by contrast, there is no basis in the record for the Court to conclude that Defendant was in good faith concerned about its reputation.  (*See* AC ¶¶ 58–59.)  Nor is there a basis to infer that Loyal Bank actually committed the crime of money laundering.  (*See id.* ¶¶ 36–37 (indicating that Loyal Bank pled not guilty and the case remains pending).)  The Court's speculation about what discovery may reveal is irrelevant, as Plaintiffs need not satisfy "a probability requirement at the pleading stage."  *Twombly*, 550 U.S. at 556.  To the extent *Wells Fargo* suggests the opposite, the Court does not find it to be persuasive.

The Court finds inapplicable Defendant's argument that Plaintiffs must allege "specific instances or acts that amounted to the breach" of its obligation to act in good faith.  (Def.'s Mem. 11 (quoting *Midwest Railcar Corp. v. Everest Railcar Servs., Inc.*, No. 16-CV-604, 2017 WL 1383765, at *5 (S.D.N.Y. Apr. 13, 2017)).)  In *Midwest Railcar*, the plaintiff alleged that the defendant did not negotiate in good faith because it made "'continued' offers in excess of fair market value" but did not "identify what those offers were, when they were made, how [the

plaintiff] responded to them, or what benchmark [the plaintiff] used to conclude that [the defendant's] offers were in excess of fair market value."  2017 WL 1383765, at *5; *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 431 (2d Cir. 2011) (noting that the plaintiff "must 'allege the specific instances or acts that amounted to the breach'" and that "'generalized allegations and grievances' will not suffice to survive a motion for judgment on the pleadings" (citation omitted)); *Lohnes v. Liberty Mut. Ins. Co*., No. 19-CV-68, 2019 WL 4451363, at *4 (N.D.N.Y. Sept. 17, 2019) (noting that "plaintiffs are required to plead 'specific factual allegations of a party's bad faith,' as 'conclusory allegations of a party's failure to act in good faith are insufficient'" (citation omitted)).  Here, by contrast, Plaintiffs allege a specific act: that Defendant terminated the License Agreement without the required good faith.  (*See* AC ¶¶ 62–67.)  Thus, Plaintiffs' claim that Defendant breached the License Agreement survives.

### 2.  Count Two: Unenforceable Termination Fee

Defendant argues that Plaintiffs fail to plead that the termination fee was an unenforceable penalty.  (*See* Def.'s Mem. 16–17.)  The Court agrees.

Under New York law, "[w]hether the early termination fee represents an enforceable liquidation of damages or an unenforceable penalty is a question of law."  *JMD Holding Corp. v. Cong. Fin. Corp.*, 828 N.E.2d 604, 609 (N.Y. 2005); *see also Bates Advert. USA, Inc. v. 498 Seventh, LLC*, 850 N.E.2d 1137, 1139 (N.Y. 2006) (same).  "The burden is on the party seeking to avoid liquidated damages—here, [Plaintiffs]—to show that the stated liquidated damages are, in fact, a penalty."  *JMD Holding*, 828 N.E.2d at 609; *see also Bates Advert.*, 850 N.E.2d at 1139 (same).  At the same time, "in determining whether a provision in an agreement is to be considered a penalty or a legally enforceable liquidated damage clause, any reasonable doubt should be resolved in favor of a construction which holds the provision to be a penalty."  *Nat'l*

*Telecanvass Assocs., Ltd. v. Smith*, 470 N.Y.S.2d 22, 24 (App. Div. 1983); *see also Brookfield*

*Asset Mgmt., Inc. v. AIG Fin. Prods. Corp.*, No. 09-CV-8285, 2010 WL 3910590, at *15

(S.D.N.Y. Sept. 29, 2010) (same).  "The party challenging a liquidated damages clause must

establish either that actual damages were readily ascertainable at the time the contract was

entered into or that the liquidated damages were conspicuously disproportionate to foreseeable or

probable losses."  *United Title Agency, LLC v. Surfside-3 Marina, Inc*., 885 N.Y.S.2d 334, 335

(App. Div. 2009); *see also Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc*., 361 N.E.2d 1015,

1018 (N.Y. 1977) ("The rule is now well established.  A contractual provision fixing damages in

the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the

probable loss and the amount of actual loss is incapable or difficult of precise estimation.").

Plaintiffs do not allege that Defendant's actual damages were readily ascertainable at the

time the contract was entered into.  (*See generally* AC.)  Instead, they appear to claim that the

amount of the termination fee was disproportionate to foreseeable losses.  (*See* Pls.' Mem. 15–

16.)  Plaintiffs allege that the Termination Fee Clause "does not differentiate between different

reasons for termination and applies the same pre-determined formula indiscriminately."  (AC

¶ 77.)  Indeed, "Mastercard may terminate a licensee based on a wide range of breaches, from

missing payments to the licensee's engagement in terrorism."  (Pls.' Mem. 15.)  As a result of

these "one-size-fits-all contractual terms," the clause was "bound to produce a termination fee, as

it did here, that is conspicuously disproportionate to the amount of Mastercard's anticipated

loss."  (AC ¶ 78.)

The Court rejects Plaintiffs' theory, as it is based on conclusory allegations.  Indeed,

Plaintiffs allege no facts regarding Mastercard's actual anticipated losses that would allow the

Court to conclude that the termination fee was disproportionate.  (*See id.*)  This silence

distinguishes this Action from *Vernitron Corp. v. CF 48 Assocs.*, 478 N.Y.S.2d 933 (App. Div. 1984), where the record allowed the court to conclude that "certain minor defaults under the lease (i.e., for a two-day delay in payment of rent) would be clearly disproportionate to the amount of liquidated damages." *Id*. at 934.  Instead, the Court finds *Hackenheimer v. Kurtzmann*, 138 N.E. 735 (N.Y. 1923), to be more directly relevant.  There, the New York Court of Appeals considered a different liquidated damages clause.  *Id*. at 738–39.  It noted that, if this clause were to apply to a breach of any contractual obligation, "no matter how trivial, . . . then undoubtedly that sum must be treated as a penalty."  *Id*. at 738.  However, it concluded that "the intention of the parties as disclosed by the contract" was that the liquidated damages provision apply only to material breaches.  *Id*.  The same principle applies here, because the Termination Fee Clause applies only if "any Mastercard member . . . ceases to be a member."  (Manual.) While multiple scenarios may lead to termination, the ultimate outcome in each case is the same. Plaintiffs have made no plausible showing that fees assessed under the Termination Fee Clause are disproportionate to the cost to Mastercard of a licensee ceasing to be a member.  *Cf. McKinley Assocs. LLC v. McKesson HBOC, Inc.*, 110 F. Supp. 2d 169, 185 (W.D.N.Y. 2000) ("Other courts, relying on *Hackenheimer*, have upheld similar liquidated damages provisions where a material term of the contract is breached, even though the liquidated damages would be considered a disproportionate penalty if applied in the case of a minor contract breach . . . ."), *aff'd*, 8 F. App'x 31 (2d Cir. 2001); *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 203 (E.D.N.Y. 1999) (noting that *Vernitron* applies where "[i]t appear[s] clear, ex ante, that the loss that might result from certain minor defaults under the lease, such as the two-day delay in payment of rent upon which [the] plaintiff sued, would be patently disproportionate to the

amount of liquidated damages" (italics omitted)).[9]  Thus, Plaintiffs' declaratory judgment cause of action is dismissed.[10]

### 3.  Count Three: Breach of Security Agreement

Defendant argues that, for various reasons, Plaintiffs' claim that Mastercard breached the Security Agreement should be dismissed.  (Def.'s Mem. 19–22.)  The Court agrees.

Plaintiffs advance three bases for their claim that Mastercard breached the Security Agreement by transferring to itself the funds in the Account.  First, they claim that Mastercard had no right to terminate the License Agreement.  (AC ¶ 88(a).)  Second, they claim that the termination fee was an unenforceable penalty.  (*Id.* ¶ 88(b).)  And, third, they claim that Mastercard's actions produced the Event of Default—liquidation—that precipitated the transfer. (*Id.* ¶ 88(c).)  The Court finds that none of these bases can be sustained.

The Court agrees that the first basis is "duplicative of Count[] One."  (Def.'s Mem. 19.) "Duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief."  *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 359 (S.D.N.Y. 2017) (quoting *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Or., Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016)); *see also Seifts v. Consumer Health Sols. LLC*, 61 F. Supp. 3d 306, 326 (S.D.N.Y. 2014) ("Where a plaintiff seeks recovery for the same damages under different legal theories, only a single recovery is allowed." (quoting *Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir.1994))).  This putative basis for Count Three is the same

---

[9] In their brief, Plaintiffs elaborate that "Loyal Bank was under no obligation to stay a Mastercard licensee indefinitely."  (Pls.' Mem. 16.)  This argument has no bearing on Plaintiffs' claims that the Termination Fee Clause was an unenforceable penalty.

[10] Because Count Two is dismissed for failure to state a claim, the Court does not consider Defendant's argument that it is procedurally defective.  (*See* Def.'s Mem. 17–19.)

as the basis for Count One, (*see* AC ¶ 88(a); *see also* Pls.' Mem. 18 (arguing that "the same reasons discussed in connection with Count[] [One]" rebut Defendant's claims regarding Count Three), and Plaintiffs seek the same relief, (*see* AC 21). Thus, this theory fails to survive. (*See id.* ¶ 88(a).)

As discussed, Plaintiffs have not adequately alleged that the termination fee was an unenforceable penalty. *See supra*. Thus, Plaintiffs' putative second basis is rejected. (*See* AC ¶ 88(b).)

Finally, the Court agrees that the claims underlying the third basis are "conclusory," and that Plaintiffs "make[] not a single factual allegation connecting the termination of the License Agreement to [Loyal Bank's] liquidation." (Def.'s Mem. 20.) Plaintiffs offer only two claims regarding the causal link between Mastercard's actions and Loyal Bank's liquidation. First, that "[o]n or about August 24, 2018, as a proximate result of the wrongful termination of the License Agreement by Mastercard, Loyal Bank was placed in liquidation . . . ." (AC ¶ 51.) Second, that "Mastercard's wrongful actions proximately caused the deterioration in Loyal Bank's financial condition that had led to the liquidation proceeding." (*Id.* ¶ 88(c).) Neither claim explains "how [Mastercard's] actions had any effect on [Loyal Bank's] performance or otherwise suggest[s] that [Loyal Bank would not have entered liquidation] but for [Mastercard's] actions." *St. Christopher's, Inc. v. Forgione*, No. 17-CV-4757, 2019 WL 3035375, at *9 (S.D.N.Y. July 11, 2019). These "formulaic recitation[s]" of the causation requirement do not suffice to state a claim. *Twombly*, 550 U.S. at 555; *see also In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 221 (S.D.N.Y. 2019) (dismissing a claim that "offer[ed] only conclusory assertions about causation"), *reconsideration denied*, No. 17-CV-3296, 2019 WL 5799762 (S.D.N.Y. Nov. 7, 2019); *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist*., No. 13-CV-4340, 2015 WL

1379702, at *6 (S.D.N.Y. Mar. 25, 2015) ("[C]onclusory allegations of causation will simply not

support a . . . claim."), *aff'd*, 637 F. App'x 16 (2d Cir. 2016).  Indeed, as Defendant notes,

Plaintiffs appear to concede this argument.  (*See* Def.'s Reply 9; *see generally* Pls.' Mem.)

Thus, Plaintiffs' putative third basis is dismissed.  (*See* AC ¶ 88(c).)[11]

### III.  Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is granted in part and denied

in part.  Count One survives, while Counts Two and Three are dismissed.  Because this is the

first adjudication of Plaintiffs' claims, this partial dismissal is without prejudice.  Plaintiffs may

file a second amended complaint within 30 days of the date of this Opinion & Order.  The Court

will hold a telephonic conference on October 5, 2021 at 1:30 P.M.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No.

30).

SO ORDERED.

DATED:      August 13, 2021
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[11] Because Plaintiffs have not plausibly alleged that Mastercard caused Loyal Bank's liquidation, the Court does not consider Defendant's argument that consequential damages are not recoverable.  (*See* Def.'s Mem. 21–22.)